STATE HIGHWAY COMMISSION v. WILLIAM A. THORNTON AND WIFE, PAULINE COBLE THORNTON.

(Filed 25 August, 1967.)

**1. Dedication § 1—**

In order to constitute a dedication, a landowner must intend to dedicate property to the public, or commit acts fairly and reasonably leading a reasonably prudent man to infer an intent to dedicate, followed by acceptance of such offer by the public.

**2. Same—**

The fact that occupants of houses upon the owner's land and persons having business or social relations with such occupants use a roadway across the land as means of ingress and egress from a public road, is alone insufficient to establish a dedication by the owner of such road to the public.

**3. Same—**

The fact that the owner records a map showing a street or road across his land does not alone constitute an offer of dedication to the public, but it is required further that such owner sell a lot with reference to such map, and even then the offer of dedication must be accepted by the public.

**4. Appeal and Error § 57—**

The court's finding supported by competent evidence will not ordinarily be disturbed, even though some incompetent evidence was also heard, since it will be presumed that the court disregarded the incompetent evidence in making its finding.

**5. Eminent Domain § 1; Injunctions § 1—**

Landowners are not entitled to the issuance of an order restraining the Highway Commission from constructing a road across their lands when the construction of the road had been completed at the time of the hearing, no request for a temporary restraining order having been made, since if an act has been accomplished it cannot be restrained.

**6. Injunctions § 14—**

Injunction may not issue against persons or corporations who are not parties to the suit.

**7. Eminent Domain § 7d—**

If the Highway Commission institutes condemnation proceedings and, pursuant thereto, enters upon and constructs a road across private lands for a private purpose, the landowners are not entitled to injunctive relief but only to a dismissal of the condemnation proceedings since, in such instance, neither a judgment of condemnation nor an award for damages for trespass could be entered in the condemnation proceedings.

**8. Same; Injunctions § 3—**

Injunction will not lie to restrain the Highway Commission from maintaining condemnation proceedings on the ground that the Commission was without authority to condemn the land, since the ground of objection is one which the landowner may assert as a defense in the condemnation proceeding itself, and therefore the landowner has an adequate remedy at law.

**9. Pleadings § 4—**

Prayer for relief does not determine the relief to which the pleader is entitled.

**10. Eminent Domain § 7d—**

Respondents' allegations and contentions to the effect that the Highway Commission was without authority to maintain the condemnation proceeding because the proceeding was to condemn respondents' land for a private and not a public purpose raise an issue to be determined by the Superior Court under the provisions of G.S. 136-108, and therefore if respondents' premise is correct, the proceeding should be dismissed.

**11. Same—**

Where respondents within twelve months of the declaration of taking file answer setting up the defense that the condemnation was for a private and not a public purpose and therefore the Commission had no authority to maintain the condemnation proceeding, such defense is asserted within the time stipulated by the statute, G.S. 136-107, and the Commission may not assert that the respondents are barred from asserting such defense because the Commission had entered upon the land immediately after the filing of the declaration of taking and had practically completed construction of the road at the time respondents filed answer.

**12. Estoppel § 4—**

Respondents are not estopped from maintaining that the Highway Commission was seeking to condemn their land for a private and not a public purpose and therefore was without authority to maintain the condemnation proceeding when there is nothing in the record to show that respondents by act or statement or silence led anyone to suppose that they would not resist to their utmost the construction of the road, since it is essential to an estoppel that the person asserting the estoppel must have changed his position to his detriment in reliance upon statements or acts of the parties sought to be estopped.

**13. Same; Eminent Domain § 1—**

The doctrine that the silence of a landowner in the face of a long and continued use of an easement across his land by an agency having the power of eminent domain may constitute the basis for an implied grant has no application when the contention is that such power does not extend to the taking in question.

**14. Eminent Domain § 3—**

Private property may not be condemned for a private purpose notwithstanding the payment of full compensation, Constitution of North Carolina, Art. I, § 17; Fourteenth Amendment to the Federal Constitution.

**15. Same—**

What constitutes a public purpose is a judicial question to be determined in the light of the circumstances of the particular case and the then current opinion as to the proper function of government.

**16. Same—**

Economic benefits to the community, anticipated from the attraction to it of a large and wealthy prospective employer, are not determinative

of whether property taken in order to accomplish that purpose is taken for a "public use."

**17. Same—**

The fact that a road ends in a *cul de sac* does not prevent it from being a public road so as to support condemnation proceedings.

**18. Same—**

A road does not cease to be a public road so as to support condemnation proceedings merely by reason of the fact that one individual or corporation may derive more benefit from it than the public generally, or because a substantial part of the anticipated cost of the construction of the road is paid by a private corporation organized for the promotion of the industrial development of the community, and a road is a public road if it is used as a matter of right by the public on an equal, common basis, irrespective of how many people actually use it.

**19. Same—   Findings held to support conclusion that road to terminal of truck carrier was for use of public and therefore for public purpose.**

The road in question was constructed for a distance of some 700 feet over the land of respondents, and ended in a *cul de sac* at the freight terminal of a truck carrier. *Held:* While a finding, supported by evidence, that the road was used by the truck carrier 24 hours a day in going to and from the public highway would not alone support the conclusion that the condemnation of the land for the road was for a public purpose, such finding with additional findings that some 700 employees of the carrier use the road for their own benefit in going to and from work, and that other members of the public used the road to transact business with the carrier, are together sufficient to support the conclusion that the road was for a public purpose.

SHARP, J., dissenting.

BOBBITT, J., concurring in the dissent.

APPEAL by plaintiff from *Hobgood, J.,* at the November 1966 Civil Session of ALAMANCE.

This is a proceeding to condemn a right of way for a road to run approximately 770 feet across a tract of land owned by the defendants from a junction with North Carolina Highway No. 62 to the property line between the defendants and Associated Transport, Inc. The purpose of the road is to provide access to the plant of Associated Transport, Inc., from Highway 62, which, in turn, connects nearby with Interstate Highway 85.

This proceeding was commenced 1 October 1965 by the issuance of a summons, the filing of a complaint, the filing of a declaration of taking, and the deposit with the Clerk of the estimated compensation due the defendants for the taking of their property. On 6 October 1965, the plaintiff began construction of the road.

The new road includes and runs upon a narrower roadway, previously opened and maintained by the defendants upon their own property. This older roadway gave access to Highway 62 from two tenant houses, owned by the defendants and occupied by their tenants, near the line of what is now the property of Associated Transport, Inc. The defendants contend that this former roadway was a private road only. The plaintiff contends that the defendants had offered to dedicate it to public use and that the act of the plaintiff in taking over its maintenance and improvement was an acceptance of such offer of dedication. Throughout the period of construction and improvement of the new road by the plaintiff, it was at all times kept open for use and was used by the tenants of the defendants and by Associated Transport, Inc., its employees, customers and other visitors.

On 22 July 1966, when the construction and improvement of the new road was 96% complete, approximately $10,000 having been expended by the plaintiff in such construction and improvement, the defendants filed their answer. In it they deny that the proposed taking of their property is for a public purpose. They allege that the road so constructed by the plaintiff does not benefit or serve any property owners other than Associated Transport, Inc., and, consequently, the condemnation of the defendants' property for this purpose is beyond the power of the plaintiff and unlawful. They pray that the plaintiff be permanently enjoined from condemning and appropriating their land and that this action be dismissed. Alternatively, they ask that just compensation for such taking be determined.

The plaintiff filed a reply alleging, as affirmative defenses to the prayer for injunctive relief, the dedication of the old, narrower roadway and laches.

By consent, all issues, other than the issue of just compensation if the taking be lawful, came on for hearing before the judge without a jury. Evidence was received and the judge made findings of fact. These include the following:

"5. That Conger Realty Company, a subsidiary corporation of Associated Transport, Inc., purchased certain real properties situated west of and adjoining the property of the defendants consisting of approximately 35 acres of land; * * * that no right of ingress or egress to said real properties existed when said properties were purchased by Conger Realty Company, and that no official employed by Conger Realty Company or Associated Transport, Inc., contacted the defendants relative to purchasing any right of way across their property to the property owned by Conger Realty Company.

HIGHWAY COMMISSION v. THORNTON.

"6. That said real properties owned by Conger Realty Company and situated adjoining the defendants' westerly boundary are occupied by Associated Transport, Inc., the largest motor hauling freight carrier east of the Mississippi River, as a trucking terminal, with an annual payroll of from $5,000,000.00 to $6,000,000.00; and that construction of said trucking terminal began on said property hereinbefore designated on August 23, 1965, at which time no condemnation proceedings had been instituted by the State Highway Commission. The construction cost of said trucking terminal was approximately $1,750,000.00.

"7. That construction of the road by the State Highway Commission across the property of the defendants to the terminal of Associated Transport, Inc., was commenced on October 6, 1965, and completed on August 23, 1966, and that since the completion of said road on the above date the road has been used by approximately 700 employees of Associated Transport, Inc., going to and from work at the terminal, Associated Transport trucks and related equipment, suppliers who come to the Associated Transport terminal for the purpose of selling supplies to Associated Transport, Inc., and its subsidiary, Brown Equipment Company, which is located at the Associated Transport terminal, service representatives who come to service trucks and equipment owned by Associated Transport, Inc., and its subsidiary, customers of Associated Transport, Inc., those who deliver their products to the terminal for shipments, visitors to the Associated Transport terminal, and the tenants occupying the two tenant homes and such persons traveling to and from said tenant homes. * * *

"11. That Conger Realty Company, the subsidiary of Associated Transport, Inc., did not purchase the real property adjoining and lying west of defendants' property until they had been assured by the Burlington-Alamance County Chamber of Commerce that the State Highway Commission would build the access road across the defendants' property. * * *

"13. That the State Highway Commission required as a condition to maintaining said condemnation proceeding that a bond be given indemnifying the State Highway Commission for any damages that it might have to pay as a result of bringing such proceeding herein, and that on August 23, 1965, such bond * * * was executed by the Burlington Industrial Corporation * * *. That subsequently the sum of $7,500.00 was deposited by the Burlington Industrial Corporation under an escrow agreement with the State Highway Commission * * *.

"14. That the cost of construction of the road in dispute which ends in a *cul-de-sac,* was $9,984.48, and that on July 22, 1966, 96.6% of the road had been completed.

"15. That said road across the defendants' property and the place at which it terminates has no scenic value whatsoever.

"16. Rules and Regulations of the State Highway Commission * * * established uniform standards which must be met before new secondary roads are added to the Highway System for maintenance. Among these requirements * * * was the requirement that 'Roads less than one mile in length must have at least four occupied residences fronting the road or with direct entrance to the road. * * *' That the road in question is less than one mile in length' and that there have never been more than two occupied residences fronting upon either the driveway which existed prior to October 1, 1965, or the disputed roadway constructed by the State Highway Commission after that date. * * *

"18. That a plat of a survey of part of the defendants' property was recorded on July 20, 1950, * * * and that said plat showed a division of part of said property into ten lots and an unlabeled driveway leading from the west side of N. C. Highway 62 in a westerly direction to the west boundary of defendants' property * * *

"20. That at the time of the recordation of said plat and at no time subsequent thereto did the defendants intend any dedication of said private road to any governmental agency or to the State Highway Commission, * * *"

Upon these findings, the court concluded that the construction of this road is for the substantial and dominant use of Associated Transport, Inc., that any use by the general public is only incidental and conjectural and that the taking of the defendants' property is not for a public use. The court further concluded that there had been no dedication by the defendants of any part of the property in question to the public use and the defendants were not guilty of laches. Accordingly, the court entered judgment permanently enjoining the plaintiff from proceeding with the condemnation and appropriation of the land of the defendants.

Among other things, Mr. Thornton testified:

"My home is about 200 feet from the north side of the road completed by the State Highway Commission that runs through my property. * * * Since the road was completed in August

of 1966, I have had occasion to observe vehicles traversing this 770 feet of road through my property. The types of vehicles I have seen traveling over this road are Associated Transport transfer trucks and cars. I have never counted the number of trucks traveling the road in a day, but it is a large number. Trucks use the road 24 hours a day. I have also observed cars going into this road from N. C. 62. After you sit there and look at them day in and day out, you see certain cars go in and they carry two people, maybe a woman and a man, the man drops out and the car comes out with one person in it, or maybe vice versa. * * * I observed the road in the process of construction. I observed traffic on the road prior to August 23, 1966, the date the road was completed. I could see the Associated Transport terminal under construction. * * * There is no question that I knew all this was going on during the time construction was going on."

*Attorney General Bruton; Deputy Attorney General Lewis; Trial Attorney Costen; Trial Attorney Briley; and Associate Counsel Kenneth W. Young for plaintiff appellant.*
*Ross, Wood & Dodge for defendant appellees.*

LAKE, J.  The Highway Commission contends that its action in improving and enlarging the old roadway, 30 feet in width, was an acceptance of the defendants' dedication of this strip of their land to the use of the public as a road. If so, the defendants, as to this part of their land, would be entitled neither to injunctive relief nor to compensation. However, the superior court concluded that the defendants had made no such dedication. This conclusion is supported by the court's findings of fact, which, in turn, are supported by the evidence.

In *Nicholas v. Furniture Co.*, 248 N.C. 462, 103 S.E. 2d 837, Parker, J., now C.J., speaking for this Court, said:

"Dedication is an exceptional and peculiar mode of passing title to an interest in land. The Supreme Court of California in *City and County of San Francisco v. Grote*, 120 Cal. 59, 52 P. 127, 128, 41 L.R.A. 335, 65 Am. St. Rep. 155, said: 'It is not a trivial thing to take another's land, and for this reason the courts will not lightly declare a dedication to public use.'"

In *Milliken v. Denny*, 141 N.C. 224, 53 S.E. 867, it is said, "The question whether one has dedicated his land to the use of the public is one of intention." It is not, however, required that there be actually an intent on the part of the landowner so to dedicate his land

to the public use, it being sufficient that there be acts by the landowner "such as would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate," followed by acceptance of such dedication by the public. *Tise v. Whitaker,* 146 N.C. 374, 59 S.E. 1012. However, where there is no showing of an actual intent to dedicate, the manifestation thereof must clearly appear by acts which, to a reasonable person, would appear "inconsistent and irreconcilable with any construction except the assent of the owner" to such public use of his property. *Milliken v. Denny, supra.* The mere fact that, with permission of the owner, occupants of houses upon his land, and persons having business or social relations with them, used the old roadway as a means of ingress to and egress from the public road is not sufficient to establish such dedication. *Nicholas v. Furniture Co., supra,* citing *Summerville v. Duke Power Co.,* 115 F. 2d 440.

It is well established that when the owner of a tract of land causes to be recorded a map thereof, showing it to be subdivided into lots, with streets, alleys or other roadways giving access from the public highway to such lots, and thereafter sells any such lot and conveys it with a reference in the deed to such map or plat, there is not only a conveyance to the purchaser of the lot of the right to use such streets and have them kept open for his use, but there is also an offer to the public which may be accepted by it. *Wofford v. Highway Commission,* 263 N.C. 677, 140 S.E. 2d 376, cert. den., 382 U.S. 822, 86 S. Ct. 50, 15 L. Ed. 2d 67; *Steadman v. Pinetops,* 251 N.C. 509, 112 S.E. 2d 102; *Blowing Rock v. Gregorie,* 243 N.C. 364, 90 S.E. 2d 898; *Rowe v. Durham,* 235 N.C. 158, 69 S.E. 2d 171; *Green v. Miller,* 161 N.C. 24, 76 S.E. 505. In *Green v. Miller, supra,* Walker, J., speaking for the Court, said:

> "The reason for the rule is that the grantor, *by making such a conveyance* of his property, induces the purchasers to believe that the streets and alleys * * * will be kept open for their use and benefit, and having acted upon the faith of his implied representations, based upon his conduct in platting the land *and* selling accordingly, he is equitably estopped, as well in reference to the public as to his grantees, from denying the existence of the easement thus created." (Emphasis supplied.)

The mere recording of a map is not an absolute, unconditional offer to the public to dedicate to its use the streets shown thereon. There must be a sale and conveyance of one or more of the lots shown upon the map by reference thereto, or some other manifestation of intent, to make the offer absolute. The recording of the map is a conditional offer, the condition being that one or more of the

lots shown upon the map be sold and conveyed. The public cannot accept that which has not been offered, nor accept that which has been offered conditionally without meeting the condition, so until there has been a conveyance of one of the lots by reference to the map, the public has no right to use the proposed roadway on the theory of dedication.

In the present case, it would be most unreasonable to suppose that the defendants, by recording their map of their land, intended, irrespective of whether they ever sold any part of their property, to give to the public the right to drive at will, in and out of their property over this "dead end" strip. The purchase of the adjoining property at the end of the "dead end" strip did not confer upon Associated Transport, Inc., any right to use this strip of the defendants' land for access to their property. *Janicki v. Lorek*, 255 N.C. 53, 120 S.E. 2d 413. None of the land shown on the defendants' map has been sold or conveyed by them. The condition attached to the defendants' offer of dedication not having been met, the act of the Highway Commission in improving the 30 foot strip did not constitute an acceptance of the offer so as to convert it into a public highway and, of itself, gave the Commission no right therein. Therefore, if this property has been properly taken by the Commission under its power of eminent domain, the defendants are entitled to fair compensation for such taking.

The plaintiff's assignments of error relating to the admission of evidence with reference to the defendants' intent to dedicate are without merit. The finding of the court was supported by competent evidence. If some incompetent evidence was also received, it is presumed that it was disregarded by the court and the error was harmless, there being nothing to show that the finding of the court was based in whole or in part upon such incompetent evidence. *Insurance Co. v. Shaffer*, 250 N.C. 45, 108 S.E. 2d 49; *Bizzell v. Bizzell*, 247 N.C. 590, 101 S.E. 2d 668.

The trial judge, apparently relying upon our statement in *Highway Commission v. Batts*, 265 N.C. 346, 361, 144 S.E. 2d 126, as to the form of judgment which ought to have been entered in that case, having concluded that in the present case the taking of the defendants' land was not for a public use and, therefore, was not within the power of eminent domain, adjudged that the Commission be "permanently restrained and enjoined from proceeding with said condemnation and appropriation of the defendants' lands." This was error, irrespective of the correctness or incorrectness of the conclusion upon which the court so decreed.

Upon this record, the defendants are not entitled to injunctive relief. The reply of the Commission and the testimony of the male

defendant establish that the road was entirely completed before the matter came on for hearing in the court below. The defendant did not apply for a temporary restraining order to halt construction. In this respect, the present case is clearly distinguishable from *Highway Commission v. Batts, supra.* As Allen, J., observed in *Yount v. Setzer,* 155 N.C. 213, 71 S.E. 209, "It requires no authority to sustain the proposition that if the act has been committed it cannot be restrained." Thus, the construction of the road being an accomplished fact, an injunction to prevent its construction could not properly be issued. No injunction could properly be entered in this action against Associated Transport, Inc., its employees, its customers, or others using this road, for none of these persons or corporations are parties hereto.

The defendants allege that the condemnation of their land sought in this proceeding "is for a private rather than a public use." From that premise, they proceed to the conclusion that the Commission has no authority to maintain these condemnation proceedings and they pray the court "that the plaintiff be permanently enjoined from condemning and appropriating defendants' lands as set forth in the complaint and that said action be dismissed." If the premise is sound, the conclusion is sound and the trial court should have entered a judgment dismissing the proceeding, but not an injunction. In *Highway Commission v. Batts, supra* at page 361, we held that an entry upon land by employees of the Commission to construct a private road was "merely an unauthorized trespass by employees of the Commission, for which no cause of action existed against the Commission" in favor of the owner of the land for damages. Certainly, damages for such a trespass cannot be awarded in a condemnation proceeding brought without authority for a purpose beyond the power of eminent domain. See 27 Am. Jur. 2d, Eminent Domain, § 478. Thus, if the premise of the defendants be sound, neither a judgment of condemnation nor an award for damages could be entered in this proceeding and it should have been dismissed.

An injunction against the institution or maintenance of condemnation proceedings, as distinguished from an injunction to restrain construction, is not properly issued, however, where the ground asserted therefor is one which the landowner may assert as a defense in the condemnation proceeding itself, for, in that event, the landowner has an adequate remedy at law. *Reidsville v. Slade,* 224 N.C. 48, 29 S.E. 2d 215. As this Court, speaking through the present Chief Justice, said in *Durham v. Public Service Co.,* 257 N.C. 546, 126 S.E. 2d 315, "Ordinarily, an injunction will not be granted where there is a full, adequate and complete remedy at law, which is as practical and efficient as is the equitable remedy." Here the defend-

ants can derive no benefit from the injunction entered below which they would not gain by a judgment dismissing the proceeding.

The holding that there was error in issuing the injunction does not dispose of the matter, however. The defendants' prayer for relief does not determine the relief to which they are entitled. Furthermore, the defendants also prayed that the proceeding "be dismissed." Their right to have such judgment entered was a matter before the trial judge, for, both by the stipulation of the parties set forth in the record and by the terms of the statute, G.S. 136-108, the hearing in the superior court was to "determine any and all issues raised by the pleadings other than the issue of damages". If the premise of the defendants' answer be correct and if they be not otherwise barred from raising the question, the defendants were entitled to dismissal of these proceedings. The trial judge concluded that their premise is correct; that is, the proceeding was instituted to condemn their land for a private, not a public purpose.

The contention of the Commission that the defendants cannot raise this question, because they did not file their answer raising it until some ten months after the summons and complaint were served on them, cannot be sustained. The defendants did not initiate this proceeding, nor did they establish the procedure to be followed therein. The State, whose agency the Commission is, and whose power it purports to exercise, established the procedure. The defendants have followed it to the letter. Even if the Commission now finds itself embarrassed by its having constructed the road prematurely, upon its own assumption that the defendants would not assert a defense which the statute authorizes (i. e., the Commission's lack of power to condemn the land), the Commission may not assert such embarrassment as a bar to this right of the defendants. The Commission may not, by precipitate entry and construction, enlarge its own powers of condemnation or shorten the time allowed by the statute for the landowner to assert his defenses.

The statutory procedure, established by the State, for actions such as the present, includes these provisions:

> *G.S. 136-106:* "Any person whose property has been taken by the Highway Commission by the filing of a complaint and a declaration of taking, may within the time hereinafter set forth file an answer to the complaint only praying for a determination of just compensation. No answer shall be filed to the declaration of taking and notice of deposit. Said answer shall, in addition, contain the following:
>
> "(1)   Such admissions or denials of the allegations of the complaint as are appropriate. * * *

"(3)   Such affirmative defenses or matters as are pertinent to the action."

*G.S. 136-107:* "Any person named in and served with a complaint and declaration of taking shall have twelve (12) months from the date of service to file answer. * * *"

*G.S. 136-108:* "After the filing of the plat, the judge * * * shall, either in or out of term, hear and determine *any and all* issues *raised by the pleadings* other than the issue of damages, including, *but not limited to,* * * * questions of necessary and proper parties, title to the land, interest taken, and area taken." (Emphasis added.)

Obviously, the word "only" in G.S. 136-106 modifies "complaint," not "praying for a determination of just compensation". That is, the defendants were authorized by the statutory procedure, established by the State, to file an answer denying that the proposed condemnation is for a public use, and were authorized to do so at any time within twelve months after the summons and complaint were served upon them. If this procedure puts the Commission at a disadvantage in constructing highways to meet the public need, the remedy is in the Legislature, not the courts. The Commission caused to be served upon the defendants a summons notifying them to answer the complaint within twelve months after service. It may not now be heard to say that an answer filed within ten months may not include a defense consisting of the denial of an essential element of the right to condemn.

The defendants are not estopped to assert that the land in question still belongs to them, free of any right of way across it. They did nothing to induce the Commission to build the road or to lead the Commission to believe they would not contest its authority to do so. They did nothing to lead Associated Transport, Inc., or its subsidiary, or the Chamber of Commerce, so to believe, or to induce Associated Transport, Inc., or its subsidiary, to purchase the adjoining property or to build its plant thereon. The trial judge found as a fact, upon ample evidence to support it, that "no official employed by Conger Realty Company [the subsidiary] or Associated Transport, Inc., contacted the defendants relative to purchasing any right of way across their property". The learned judge likewise found that the plant site was purchased from persons other than the defendants in March and May 1965 and construction of the plant was begun 23 August 1965, "at which time no condemnation proceedings had been instituted". Again, he likewise found the condemnation proceedings were instituted 1 October 1965 and the Com-

mission began construction 6 October 1965, *the fourth day after service* of the papers on the defendants. The male defendant testified that no representative of the Commission ever communicated with him about its right to build the road. This is uncontradicted. The only representative of the Commission to testify concerning this point was its District Engineer, who said:

> "I did talk with Mrs. Thornton one day * * * Probably in November of 1965. I have never met Mr. Thornton. * * * When I talked with Mrs. Thornton, the only thing she said was that they did object to the road but she didn't state what they would do to recover damages or anything. * * * It was not our place for me or anyone under my supervision to talk with Mr. or Mrs. Thornton and attempt to negotiate with them about this right of way. We did not. We were notified it was all cleared up and we went ahead with the work. The Right of Way Department in Greensboro notified us that the Declaration of Taking had been filed and we could proceed with the construction".

It is abundantly clear that, as the trial court found, Associated Transport, Inc., relied upon assurances by the Chamber of Commerce, or a related organization, that the Commission would build the road, not upon anything the defendants did or did not do or say. The Commission relied upon its own opinion as to the effect of filing the summons, complaint and declaration of taking, not upon anything the defendants did or did not do or say. The record is clear, as the trial judge found, that the defendants rejected all overtures by the Chamber of Commerce. There is nothing in the record to show any act or statement, inaction or silence, by the defendants, or either of them, which led anyone whomsoever to suppose that the defendants would not resist to their utmost ability the construction of the road across their land.

As recently as *Bourne v. Lay & Co.*, 264 N.C. 33, 140 S.E. 2d 769, Denny, C.J., speaking for this Court, said:

> "It is essential to an equitable estoppel that the person asserting the estoppel shall have done or omitted some act or changed his position *in reliance upon* the representations or conduct of the person sought to be estopped." (Emphasis added.)

Again, in *Washington v. McLawhorn*, 237 N.C. 449, 75 S.E. 2d 402, Parker, J., now C.J., speaking for the Court, quoted with approval the following statement from *Bank v. Winder*, 198 N.C. 18, 150 S.E. 489:

"Equitable estoppel is defined as 'the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract or of remedy, as against another person who in good faith *relied upon* such conduct, *and* has been *led thereby* to change his position for the worse, and who on his part acquires some corresponding right either of contract or of remedy'." (Emphasis added.)

Earlier, Walker, J., speaking for the Court in *Boddie v. Bond,* 154 N.C. 359, 70 S.E. 824, discussed the doctrine of equitable estoppel at length saying:

"This estoppel arises when any one, by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence *induces* another to believe certain facts exist, and such other rightfully *relies and acts on* such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." (Emphasis added.)

To the same effect see: *Matthieu v. Gas Co.,* 269 N.C. 212, 216, 152 S.E. 2d 336; *Smith v. Smith,* 265 N.C. 18, 143 S.E. 2d 300; *Long v. Trantham,* 226 N.C. 510, 39 S.E. 2d 384; *Scott v. Bryan,* 210 N.C. 478, 187 S.E. 756.

There being nothing whatever to show any reliance placed by the Commission, or by any other person concerned, upon the silence of the defendants as indicating their consent to the construction of the road or their recognition of the right of the Commission to take their land in order to build it, there is no basis for holding the defendants are estopped to assert in their answer that these proceedings are unauthorized because the contemplated condemnation is for a non-public use. The Commission entered upon the land in reliance upon its own opinion as to its authority. If that opinion was correct, it entered lawfully and these proceedings cannot be dismissed, the defendants' only remedy being a determination of the reasonable compensation to be paid. If that opinion was erroneous, the defendants are entitled to have this proceeding dismissed, leaving them to whatever rights they may have against those who have trespassed upon their land and propose to continue to do so.

In *Railroad v. Manufacturing Co.,* 229 N.C. 695, 51 S.E. 2d 301, the railroad company, having the power of eminent domain, laid its track across land of the defendant without any proceeding to determine the compensation due the landowner for such taking. Many years later, it sued to compel the removal of a fence upon the right

of way which it would have acquired had it originally followed the prescribed procedure. This Court held the landowner's long continued silence was sufficient to confer upon the railroad a right of way by implied grant or by operation of law. See also, *Bruton v. Light Co.,* 217 N.C. 1, 6 S.E. 2d 822, where it was said that a lower riparian owner could recover damages only for alteration in the flow of a river by the construction of a dam by a company possessed of the power of eminent domain, and 27 Am. Jur. 2d, Eminent Domain, §§ 478 and 483, where the doctrine of "inverse condemnation" is discussed. These authorities have no application where, as here, the contention is that the power of eminent domain does not extend to the taking in question. Also distinguishable from the present case are *Lloyd v. Venable,* 168 N.C. 531, 84 S.E. 855, and *McDowell v. Asheville,* 112 N.C. 747, 17 S.E. 537, holding that where there is a taking not within the power of eminent domain the landowner may elect to claim damages as if the taking had been lawful. Here, the defendants deny the validity of the taking and ask for an award of damages only in the event their attack upon the validity of the taking is decided adversely to them.

It is, therefore, necessary for us to determine whether the power of eminent domain, conferred by statute upon the Commission, extends to the taking by it, against the owner's will, of a right of way for a road constructed for the purpose for which the Commission constructed the road here in question; that is, we must determine whether the trial court erred in its conclusion that the road in question was not constructed for a public use. If that conclusion was correct, the proceeding should have been dismissed. If that conclusion was error, the proceeding should be remanded for a further hearing to determine the compensation to be awarded the defendants for the taking of their land.

It is clear that private property can be taken by exercise of the power of eminent domain only where the taking is for a public use. *Highway Commission v. Batts, supra; Charlotte v. Heath,* 226 N.C. 750, 40 S.E. 2d 600. The difficulty lies in determining what is a "public use." Here also it is important to bear in mind the observation by the Supreme Court of California, above quoted, that "It is not a trivial thing to take another's land." It is not a sufficient answer that the landowner will be paid the full value of his land. It is his and he may not be compelled to accept its value in lieu of it unless it is taken from him for a public use. To take his property without his consent for a non-public use, even though he be paid its full value, is a violation of Article I, § 17, of the Constitution of this State and of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

In holding unconstitutional an act of the Legislature conferring upon private owners of timberland the right to condemn a right of way over the lands of another for a railway, which would be used exclusively to transport the timber of the owners of the railway, this Court, speaking through Connor, J., said in *Cozard v. Hardwood Co.,* 139 N.C. 283, 51 S.E. 932, "It has sometimes happened that a stubborn and possibly sentimental owner of land has stood in the way of the development of the country and of the impatient, strenuous promoter and industrial pioneer." The Constitution of our State protects him in that right, nothing else appearing. He may not, however, stand in the way of the sovereign state, which seeks to take his property for a public use in return for the fair value of the property so taken.

What is a "public use" justifying the exercise of the power of eminent domain cannot be stated with precision for all cases. Each case must be evaluated in the light of its peculiar circumstances and the then current opinion as to the proper function of government. *Highway Commission v. Batts, supra; Charlotte v. Heath, supra.* In 26 Am. Jur. 2d, Eminent Domain, § 27, it is said of the varying views expressed in the decisions of many jurisdictions:

> "One line of decisions holds that public use means *use by the public* — that is, public employment — and consequently that to make a use public, a duty must devolve on the person or corporation holding property appropriated by right of eminent domain to furnish the public with the use intended, and that there must be a *right* on the part of the public, or some portion of it, or some public or quasi-public agency on behalf of the public, to use the property after it is condemned. * * * The opposing doctrine is that public use means *public advantage, convenience, or benefit,* and that anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, contributes to the general welfare and the prosperity of the whole community and, giving the Constitution a broad and comprehensive interpretation, constitutes a public use." (Emphasis added.)

The public benefit, through the bringing into the community, or the development therein, of a new source of wealth and employment, is, of course, a proper consideration for the legislative or the administrative agency in determining whether it is expedient to exercise the power of eminent domain. See *Reed v. Highway Commission,*

209 N.C. 648, 184 S.E. 513. With that the courts are not properly concerned. *Yarborough v. Park Commission*, 196 N.C. 284, 145 S.E. 563; *Jeffress v. Greenville*, 154 N.C. 490, 70 S.E. 919. Whether the purpose of the taking is one which brings the taking within the constitutional power of the legislative or administrative agency is, however, a judicial question. *Highway Commission v. Batts, supra; Redevelopment Commission v. Bank*, 252 N.C. 595, 114 S.E. 2d 688; *Jeffress v. Greenville, supra.* The economic benefits to the community, anticipated from the attraction to it of a large and wealthy prospective employer, are not determinative of whether property taken in order to accomplish that purpose is taken for a "public use". The home or other property of a poor man cannot be taken from him by eminent domain and turned over to the private use of a wealthy individual or corporation merely because the latter may be expected to spend more money in the community, even though he or it threatens to settle elsewhere if this is not done. This the Constitution forbids.

The right of the plaintiff to acquire the property of the defendants by eminent domain depends, therefore, upon whether the new road is a public road or is a road for the private benefit of Associated Transport, Inc., not upon the undoubted benefits to the community of having the plant of Associated Transport, Inc., located nearby.

The fact that the road ends in a cul-de-sac does not prevent it from being a public road. *Highway Commission v. Batts, supra;* 26 Am. Jur. 2d, Eminent Domain, § 46. It is also immaterial that a substantial part of the anticipated cost of acquisition and construction was paid by a private corporation organized for the promotion of the industrial development of the community. *Charlotte v. Heath, supra; Deese v. Lumberton*, 211 N.C. 31, 188 S.E. 857; *Stratford v. Greensboro*, 124 N.C. 127, 32 S.E. 394. A road does not cease to be a public road merely by reason of the fact that one individual or corporation derives more benefits from it than does anyone else. See *Stratford v. Greensboro, supra; Cobb v. Railroad*, 172 N.C. 58, 89 S.E. 807; 26 Am. Jur. 2d, Eminent Domain, § 32. On the other hand, the fact that the Highway Commission calls or designates the road a public road does not settle the matter. *Highway Commission v. Batts, supra;* 26 Am. Jur. 2d, Eminent Domain, § 46. This is so because the question of whether the taking of the defendants' property is a taking for a "public use" is to be determined ultimately by the courts, not by the administrative agency.

It is frequently stated that if the public generally may use the road, as a matter of right, on an equal, common basis, the road is a public road irrespective of how many people actually use it. 26

Am. Jur. 2d, Eminent Domain, §§ 31, 46. See also: *Charlotte v. Heath, supra; Cozard v. Hardwood Company, supra.* Nevertheless, though a road be called a public road by the governmental agency which builds it, if, in reality, it is by its very nature and location to be used only by one family or corporation, save for occasional incidental use by visitors, it is not a public road and the property of another person cannot be taken for its construction under the power of eminent domain. *Highway Commission v. Batts, supra.* In the *Batts* case, we said, "[T]he State Highway Commission has no power to condemn private property to construct a road for the private use of any person or group of persons, and if it does so, it is an arbitrary act and an abuse of the discretion vested in it." In that case, anyone who wanted to use the road could have done so, but its location and nature were such as to lead this Court to the conclusion that it was built for the use of but one family. Consequently, we held that the taking of the property of their neighbor for its construction was not a permissible use of the power of eminent domain.

Thus, if the road here in question led to a mere parking or storage facility of Associated Transport, Inc., so that, in reality, its only use would be by the trucks of that company, traveling on its business, the road would be, in fact, a private road and the taking of the defendants' land for its construction, contrary to the will of the defendants, would be beyond the power of the Highway Commission. That, however, is not what the superior court found to be the fact. Its finding, supported by the evidence, shows that some 700 employees report for work at this plant of Associated Transport, Inc. To get to their work they drive in their own vehicles along the road in question. In so doing, they are not acting for Associated Transport, Inc., but are using the road for their own benefit and purpose. The superior court found also that customers of Associated Transport, Inc., use the road to deliver to it and receive from it freight, and suppliers of Associated Transport, Inc., use the road for the sale and delivery of their products and services. A road used by large numbers of people to reach their place of employment and by many others to reach the place at which they will transact business cannot be said to be a private road for the sole benefit of the proprietor whose plant is located at its terminus.

This is not a proceeding to condemn land for use as a site upon which to build a private business establishment. It is a proceeding to condemn a right of way for a road. The facts found by the trial judge concerning the use of this road, all of which findings are supported by the evidence, are a far cry from the contemplated use of

the proposed road in *Highway Commission v. Batts, supra.* It is not necessary to determine how many people must use a road, or how often it must be used, in order to make it a public road. It is enough to say that habitual use, day after day, by 700 people to go to and from their place of employment, by an undisclosed number of shippers and consignees to take their freight to and receive it from the terminal of a major common carrier, by the suppliers of services and commodities to the operator of that terminal and by the trucks of that carrier in the transportation of freight is a use by the public of the road. The fact that all users of the road travel to or from that terminal does not make the road one for the private use of the owner of the terminal. Nichols, Eminent Domain, 3d ed., § 7.512(1); 39 C.J.S., Highways, § 27.

Consequently, the facts found by the superior court do not support its conclusion that the defendants' land was taken for a nonpublic use. On the contrary, the facts so found establish the ultimate fact that the road is a public road and the taking of the defendants' property for its construction was a taking for a public use and, therefore, within the power of eminent domain conferred by the Legislature upon the plaintiff. For this reason, this proceeding should not be dismissed but must be remanded to the superior court for the determination of the issue as to the compensation to be awarded the defendants for the taking of their property.

Reversed and remanded.

SHARP, J., dissenting: Associated Transport, Inc., although subject to regulation by the North Carolina Utilities Commission, has no right of eminent domain. This decision, however, establishes the power of the State Highway Commission to condemn a right-of-way for a road to the plant of any private industry with a payroll which the Chamber of Commerce, or some other group able to influence the Highway Commission, decides is large enough to benefit the economy of the community. It is a decision which will rise to haunt not only this Court but also the Highway Commission, for any private corporation can now say to it, "Condemn us a road and we will employ enough people, so that you can justify it as a public road." But how many employees are enough to make "a public?" And surely the applicant for a "public road" must be a business big enough and so well established as to justify confidence in its continuing payroll. But what of the rights of the entrepreneur in this land of equal opportunity? Is only Big Business to be thus "encouraged to locate" here?

In this case, the State Highway Commission has built a road to give 700 employees of Associated Transport, Inc., access to its plant.

Despite that number, however, the fact remains that the road was not constructed for the use by the public as that term is generally understood. It is pointed out that, because the State Highway Commission has condemned it, the public generally will have the *right* to use the road. That right does not make a road which ends at a private plant, with no scenic appeal, serve a public purpose. Of the general body of the community, only those citizens who are employed by Associated or who have business with that trucking company will ever use the road.

In *Highway Commission v. Batts*, 265 N.C. 346, 144 S.E. 2d 126, in striking down a finding of the Superior Court judge that the Highway Commission's appropriation of a landowner's property was for the purpose of a public road, this Court, speaking through Parker, C.J., said:

> "(H)e should have found as facts and concluded as a matter of law and adjudged that the condemnation and appropriation of a right of way across lands of defendants . . ., ending in a *cul de sac* on the lands of J. M. Batts, was not for a public use, but was for the substantial and dominant use and benefit of W. M. Batts and wife, and a few of their relatives, and that any use by, or benefit to, the public would be merely incidental and entirely conjectural, and that the building of the proposed road by plaintiff will be an abuse of the discretion vested in it to establish, construct, and maintain highways, . . . and he should have issued an injunction permanently restraining plaintiff from proceeding with the condemnation and appropriation of their lands." *Id.* at 361, 144 S.E. 2d at 137.

The difference between this case and *Batts* is one of degree only; the principle is the same. Patently, Judge Hobgood acted in reliance upon the *Batts* case when he enjoined the Highway Commission in this case.

In *Batts*, the court hewed closely to the line that private property can be taken only for a public use. In this case, while protesting to the contrary, the court discards the criterion of public use for the "public benefit" theory. The difference between the two is well stated in *Smith v. Cameron*, 106 Ore. 1, 210 P. 716, 27 A.L.R. 510:

> "There are two main lines of judicial decisions — one holding that the word 'use' is to be taken in its primary sense, and that when so taken it means, stated briefly, 'employment;' the other holding that the word should be given its secondary meaning, and that, when so applied, it means, stated briefly, 'advantage.' 1 Lewis, Em. Dom. 3rd ed., sec. 252; 20 C.J. 552;

* * * Under the authority of that line of decisions which gives the word 'use' its secondary meaning, some courts have gone to the extent of holding that 'public use' is synonymous with 'public benefit,' 'public utility,' or 'public advantage.' * * *

"The courts, including this Court, which takes the opposing view, asserts that there is a distinction between a public use and a benefit to the public, and that private enterprises that give employment to many people and produce large quantities of commodities of various kinds are not necessarily public uses, and that the term 'public use' as used in constitutions · is not synonymous with the term 'public benefit.' * * * The .idea emphasized by this main line of decisions is expressed by Judge Cooley thus: 'The public use implies a possession, occupation, and enjoyment of the land' by the public or public agencies, and it is not enough 'that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises.' " Cooley, Const. Lim. 7th ed. 766.

In *Cozard v. Hardwood Co.*, 139 N.C. 283, 51 S.E. 932, a case cited in the majority opinion, the Court enjoined defendant from constructing a railroad. (This was not a railroad established under G.S. 136-69, then § 2023 of the N. C. Code of 1883.) Defendant had obtained from the Valleytown Township Highway Commission an order for a right-of-way over plaintiff's property for a railway to transport timber to market.

In answering the argument of defendant's counsel that the timber which the railroad would haul from the mountains would establish tanneries and factories, open land for cultivation, develop natural resources, increase immigration, and bring wealth to the State, the Court said, "They invite courts to find in the term 'public use' a broader and larger meaning. . . ." but "great and dangerous monopolies have been fostered by the liberal construction put upon the term 'public use'." Connor, J., who wrote the opinion quotes from *Bloodgood v. R. R.*, 18 Wend. 9, 31 Am. Dec. 311, in which it is said:

"'When we depart from the natural import of the term "public use" and substitute for the simple idea of a public possession and occupation that of public utility, public interest, common benefit, general advantage or convenience, or that still more indefinite term, public· improvement, is there any limitation which can be set to the exertion of legislative will in the appropriation of private property? The moment the mode of its

use is disregarded and we permit ourselves to be governed by speculations upon the benefits which may result to localities from the use which a man or set of men propose to make of the property of another, we are afloat without any certain principle to guide.' Judge Cooley says: 'It seems not to be allowable, therefore, to authorize private roads to be laid out across the lands of unwilling parties by an exercise of this right. The easement in such case would be the property of him for whom it was established.' Const. Lim., 652." *Id.* at 245, 246, 51 S.E. at 936.

The authorities which support the two doctrines of public use are collected in 26 Am. Jur. 2d, Eminent Domain §§ 27 and 28 (1966). With reference to the public benefit doctrine, it is said:

"Many courts have pointed out that almost any legitimate business enterprise, indirectly to some extent, may be regarded as a benefit to the public, and that an indefinite field is opened up when the doctrine is accepted that public benefit alone is sufficient to make the use a public one, warranting the exercise of the power of eminent domain. The apparent conflict among the authorities may be accounted for in the different conditions that exist in different states. The trend of authority seems to be away from any general definition of the term 'public use' as synonymous with public benefit, and toward the restriction thereof, except in certain rather well-defined fields, to the meaning of use by the public.

"The doctrine that public benefit and utility are a justification for the exercise of the power of eminent domain has been associated especially with four classes of cases: (1) those relating to the development of water power for mills under general or special mill or flowage acts; (2) those arising under drainage acts for the reclamation of wet and marshy land; (3) those relating to the irrigation of arid land; and (4) those relating to the promotion of mining. In some of the states further uses have been recognized by special constitutional provisions. In other words, the doctrine has been applied where location of the private enterprise in question was not a matter of the owner's choice or convenience, but was absolutely or practically fixed, and necessity seemed, therefore, to the court to call for a more liberal interpretation of the term 'public use' than in ordinary cases. The tendency has been to place the decisions, even in those classes of cases in which the exception is recognized by some courts, on other grounds than the law of eminent domain to refuse to extend the public benefit doctrine, and to take the

position that under present conditions, if the question were a new one, a different conclusion would be reached. The public benefit doctrine has no application if the undertaking for which the land is to be condemned is not confined by its inherent nature to a fixed location." *Id.* § 28.

Associated Transport's road runs 770 feet across defendants' land from Highway No. 62, to Associated's plant, where it dead-ends. Associated Transport trucks and cars of its employees use the road, which is about 200 feet from defendants' residence. "Trucks use the road 24 hours a day."

A subsidiary corporation of Associated bought the land on which it erected its plant *knowing at the time* of the purchase that it had no right of ingress to or egress from its property. Furthermore, neither Associated nor its subsidiary has ever attempted to buy a right-of-way from defendants across their property! Ordinarily no private business, firm, or corporation would do such a thing — and certainly Associated could have found other land — but it bought with confidence for "they had been assured by the Burlington-Alamance Chamber of Commerce that the State Highway Commission would build the access road across the defendants' property." Prior to this decision, the right of private property has not been subject to such invasion. *Highway Commission v. Batts, supra.* Heretofore, when a landlocked industrial or manufacturing plant has been unable to purchase a right-of-way or to acquire an easement of access, it has proceeded under G.S. 136-69 to have a cartway laid off and paid the damages which the jury of view assessed.

Defendants will no doubt be startled to read in the majority opinion that "the home or other property of a poor man cannot be taken from him by eminent domain and turned over to the private use of a wealthy individual or corporation merely because the latter may be expected to spend more money in the community, even though he or it threatens to settle elsewhere if this is not done. This the Constitution forbids." It does indeed!

My vote is to affirm the judgment of the court below, which permanently enjoined plaintiff from proceeding with the condemnation and appropriation of the land of defendants.

BOBBITT, J., concurring in dissent. The judgment is reversed on the ground the court's factual findings establish the Highway Commission's legal right to condemn a right-of-way over defendants' land. As to this, I dissent, being in accord with the views expressed in the dissenting opinion of Justice Sharp.

Of course, if the Highway Commission is permitted to condemn

the right of way, thereafter the road will be available for use by the public, generally as a part of the highway system. The question is whether it is being condemned for use by the public generally or for use exclusively in connection with Associated Transport's premises and business. The road does not extend *through* Associated Transport's premises but stops at its property line. All anticipated use thereof, however extensive, will be by persons employed by or having business with Associated Transport.

General economic benefit to the community of a private business or industry, old or new, is not sufficient to justify the exercise of the power of eminent domain in its behalf. Otherwise, the State could exercise its power of eminent domain to condemn land for use as a site for such business or industry.

Neither Associated Transport nor Burlington Industrial Corporation has the power of eminent domain, an attribute of sovereignty. Here, the Highway Commission is attempting to exercise its right of eminent domain to do for the Associated Transport what it would do if it had such right. The Burlington Industrial Corporation is obligated to save harmless the Highway Commission in respect of the amount it is required to pay defendants as compensation.

It would be difficult to distinguish the present case from any factual situation where a new restaurant, department store, or other private enterprise, reasonably calculated to attract large numbers of employees, suppliers and customers, would seek to make use of the Highway Commission's power of eminent domain to provide an *access* road to such establishment.